IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SHIRLEY MORTON BAILEY,            )
                                  )
    Plaintiff,                    )
                                  )
v.                                )   Case No. 3:04cv1045
                                  )
YOUTH VILLAGES, INC.,             )   Judge Thomas A. Wiseman, Jr.
                                  )
    Defendant.                    )

### MEMORANDUM OPINION

Plaintiff Shirley Morton Bailey brings this case alleging claims of age and race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e through 2000e-17 ("Title VII") and the Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-101 through - 408 ("THRA"). Presently pending before the Court is Defendant Youth Villages, Inc.'s Motion For Summary Judgment (Doc. No. 16), in support of which Youth Villages also filed a Memorandum of Law (Doc. No. 17), Statement of Undisputed Material Facts (Doc. No. 18), and various exhibits and affidavits. Ms. Bailey filed her response in opposition to summary judgment and supporting Memorandum (Doc. Nos. 21 and 22), response to Defendant's statement of undisputed facts (Doc. No. 27) along with her own supporting exhibits and affidavits, and a Statement of Additional Material Uncontested Facts (Doc. No. 28). The Court ordered Youth Villages' initial reply to Plaintiff's Statement of Additional Facts stricken for failure to comply with Local Rule 8, but permitted Youth Villages to refile its reply, this time in compliance with Local Rule 8. Youth Villages has also submitted a reply brief (Doc. No. 48) and an additional declaration. By separate Memorandum and Order, the Court granted in part and denied in part Defendant's motion to strike certain portions of three affidavits submitted by Ms. Bailey in support of her position. In reaching the holding set forth herein, the Court has relied only upon those portions of the affidavits found to be admissible and relevant to the present motion.

As set forth below, disputed issues of material fact preclude summary judgment of Ms. Bailey's claims of race-based discrimination and retaliation. The Court will, however, grant summary judgment as to the claims of age discrimination and retaliation.

I.  ALLEGATIONS OF FACT

Plaintiff Shirley Bailey is an African-American woman who is presently 66 years old. She was 64 at the time of the events giving rise to this action. Ms. Bailey received a B.S. in sociology from Austin Peay State University in 1982. She earned a master's degree in guidance and counseling from Austin Peay in 1990.

Defendant Youth Villages is a non-profit, licensed mental health and social services agency that offers services to children who have been abused, neglected or abandoned, or have emotional problems. Ms. Bailey was hired by Youth Villages in an entry-level position as a counselor in 1996. She worked at Youth Villages from 1996 until she was discharged in October 2003.

From 1996 through 2001, Ms. Bailey received regular pay raises and promotions, and her annual reviews were generally very positive. In the spring of 2001, Ms. Bailey was promoted to the position of Clinical Program Supervisor/Consultant. Ms. Bailey's job responsibilities in that position included but were not limited to providing clinical case consultation to ten "teams," each of which typically consisted of a supervisor and four counselors. Over the next two years in that position, Ms. Bailey's annual performance reviews were increasingly positive. In her last annual review, in March 2003, she received an overall score of 4.38 out of 5. In the sub-areas in which she scored the lowest, she still was deemed to "meet[ ] job requirements." (Doc. No. 17, Ex. 3, 11/14/2005 Kromer Aff. ("Kromer Aff."), Ex. B.) Ms. Bailey also received annual pay raises in 2001, 2002 and 2003. Charmaine Kromer, who was Ms. Bailey's supervisor throughout her employment with Youth Villages, was responsible for the promotions and pay increases Ms. Bailey received, all of which were approved by Ms. Kromer's supervisor, Barbara Grunow, then Middle Tennessee Regional Director for Youth Services.

Youth Villages employs a treatment method known as "Multi-Systemic Treatment" or "MST." MST Services, a company based in Charleston, South Carolina, provides consultation, training and quality assurance oversight to various organizations that utilize the MST approach developed by the Medical University of South Carolina. Youth Villages is one of the organizations to which MST Services provides such support services. More specifically, MST Services contracts with Youth Villages to provide training and mentoring to Clinical Program Supervisors like Ms. Bailey. However, only a few Clinical Program Supervisors at Youth Villages participate in training with MST Services at any given time.

2

In June of 2002, Plaintiff was selected to participate in the specialized MST Services training to assist her in her role as a Clinical Programs Supervisor/Consultant. As part of this process, Ms. Bailey was assigned to work with Lisa Reiter-Lavery, MST Services Manager of Network Partnerships. Ms. Reiter-Lavery was not Ms. Bailey's supervisor in any capacity. Rather, she was an MST Services employee who functioned as a coach and mentor for Ms. Bailey in the implementation of the MST method. In that capacity, Ms. Reiter-Lavery engaged in weekly telephone conferences with Ms. Bailey, reviewed audio tapes and conducted quality assurance reviews of other work products, all for the purpose of training and tracking Ms. Bailey's development as an MST Consultant. Ms. Bailey, in her role as MST Consultant, was expected to have knowledge of the Multi-Systemic Therapy program implemented by Youth Villages, and in that capacity to prepare development plans and training materials for supervisors and counselors working under her supervision. As part of Ms. Bailey's training process, Ms. Reiter-Lavery provided regular feedback to Ms. Bailey and to Ms. Bailey's supervisors at Youth Villages, Charmaine Kromer and Greg Winterburn.

As to the above facts, there appears to be no real disagreement. With respect to the chain of events beginning in August 2003 and culminating in Ms. Bailey's termination on October 2, 2003, the parties' versions of events vary sharply. In fact, in the affidavit she submitted in support of her opposition to summary judgment, Ms. Bailey disputes basically the entire factual background set forth by Youth Villages in support of summary judgment. While this affidavit is somewhat overwrought in tone and completely lacking in specificity, to the extent it appears to be based upon personal knowledge and otherwise admissible evidence, the Court must accept Ms. Bailey's version of events for purposes of ruling on the motion for summary judgment.

According to Ms. Bailey, her performance evaluations during her entire tenure with Youth Villages were "satisfactory to excellent" up until late August 2003, shortly after she disagreed with Charmaine Kromer about Ms. Bailey's decision to support Qusayy Godbolt, a senior counselor with Youth Villages, and Rosalind Thompson, his clinical supervisor, on their decision not to go into a home where racial slurs and threats of violence had been directed at Mr. Godbolt. According to Ms. Bailey, after she reported this incident to Ms. Kromer, Ms. Kromer insisted that Mr. Godbolt return to that home and issued a directive that he do so. Mr. Godbolt and Ms. Bailey have testified in affidavits that they disagreed with Ms. Kromer, and expressed their disagreement. Despite the alleged directive issued by Ms. Kromer, Ms. Bailey did not require Mr. Godbolt to

3

go back to the home. (This incident is referred to hereafter as the "Godbolt incident.") Ms. Bailey, Mr. Godbolt and Ms. Thompson all allegedly perceived Ms. Kromer's reaction to the incident as racist.[1] Mr. Godbolt resigned his employment with Youth Villages shortly after this event. He claims he resigned because he perceived himself to be the victim of racial discrimination, but he did not file a claim with the EEOC or make any allegation of racism in his resignation letter.

At any rate, Ms. Bailey claims that, beginning immediately after the Godbolt incident, she suddenly began to be told by Ms. Kromer that her job performance was unsatisfactory. For instance, on August 27, 2003, Ms. Bailey received the lengthy "List of Expectations" (hereafter, "List") which purported to set forth the tasks required of her in her capacity as Clinical Programs Supervisor/MST Consultant. Ms. Bailey alleges that she first received the List from Ms. Grunow, but the documentary evidence submitted by Youth Villages actually demonstrates conclusively that she received the List on August 27 via e-mail from Ms. Kromer, as set forth in greater detail below. Regardless, Ms. Bailey allegedly perceived the List as a disciplinary action taken against her in retaliation for her decision to support Mr. Godbolt and Ms. Thompson and her defiance of Ms. Kromer's alleged directive in the Godbolt incident. Ms. Bailey communicated to Ms. Grunow that she felt that the List was unreasonable, that she would not be able to perform her job if she abided by the List, that she felt she was being set up to fail, and that she believed it to be a discriminatory action based upon her race. After Ms. Bailey expressed her view of the Expectations to Ms. Grunow, Ms. Grunow allegedly told her that her options were to "quit, follow the list, or be terminated." (Doc. No. 26, 12/15/2005 Bailey Aff. ("Bailey Aff."), ¶ 31.)

---

[1] Ms. Bailey and Ms. Thompson both allege in their respective affidavits that when white counselors were uncomfortable going into a home, they were not forced to do so. The allegations in this regard are lacking in the requisite specificity to constitute evidence of a pattern of racism. For instance, Ms. Thompson states one example of one white employee, Heather Oulsey, who was taken off a case, and the case was reassigned, when Ms. Oulsey expressed that she was not comfortable going into the home. (Doc. No. 25, 12/15/2005 Thompson Aff. ¶ 19.) She does not indicate when that incident occurred, what exactly happened that made Ms. Oulsey "uncomfortable," or who her supervisor was at that time. Ms. Bailey declared in her affidavit, "They would reassign the white employees when th[ey] were uncomfortable going into a particular home, but would not reassign the blacks, which I considered discriminatory" (Doc. No. 26, 12/15/2005 Bailey Aff. ¶ 24), without identifying who "they" were or describing any specific incidents she had observed. That this testimony is simply inadmissible hearsay is conformed by Ms. Bailey's subsequent statement in the same affidavit that she "was advised that white counselors were typically reassigned when they expressed discomfort with a particular home," but that "African-Americans . . . were not reassigned similarly to whites." (Doc. No. 26, 12/15/2005 Bailey Aff. ¶¶ 32, 33.) None of this proffered testimony is admissible to prove disparate treatment of white and black counselors under similar circumstances.

4

Ms. Bailey also alleges that she was told by Ms. Kromer around the same time that she could not consult with other counselors, even though such consultations were a required part of her job.

Kathi Coates, the other Clinical Programs Supervisor/Consultant supervised by Ms. Kromer, also received a nearly identical List of Expectations. Ms. Bailey argues, however, that because Ms. Coates was not participating in the MST training, the constraints imposed by the List would not have the same effect on her as they did on Ms. Bailey. According to Ms. Bailey, none of the other MST Consultants received a similar List of Expectations. According to Youth Villages, however, none of the other MST Consultants at that time was supervised by Ms. Kromer.

Ms. Bailey further avers that the List of Expectations did not correlate with the job description provided in the training manual by MST Services, and that the List was deliberately designed to stress and hinder her performance. Ms. Bailey states that there had never been any discussions regarding the expectations laid out in the List prior to her receiving the List, and if there had been, this would have been reflected in the notes sent to her by Ms. Reiter-Lavery summarizing the contents of their weekly consulting meetings. In fact, the "Development Update" filled out by Lisa Reiter-Lavery on August 25, 2003 (Doc. No. 37, Ex. D, produced by Plaintiff) indicates that Ms. Bailey was "extremely invested in meeting the expectations currently being set by Charmaine [Kromer] and Lisa [Reiter-Lavery]." The same Update notes several objectives and goals that Ms. Bailey had not met that week, including providing revisions for the quarterly training session for which she was responsible. It's tone is generally positive, however, and Ms. Bailey claims she was told by Ms. Reiter-Lavery around the same time frame that she was "doing well, had strong clinical knowledge, and had scored 80%+ in all areas." (Bailey Aff. ¶ 38.) Ms. Bailey further avers, in response to Youth Villages' allegations regarding her failure to develop certain training materials for a quarterly training session to be held for the counselors and regional supervisors whom she supervised, that she was not actually the person responsible for developing these training materials. According to Ms. Bailey, the only training materials she was developing were certain parts about which she had expressed concern as being too advanced and complex for counselors who had only a bachelor's degree and minimal counseling experience. (Bailey Aff. ¶ 39.)

Ms. Bailey places great emphasis on the fact that she repeatedly requested a job description from Youth Villages, distinct from the List of Expectations, but never received one. She claims that she asked again for such a job description during a meeting held October 2, 2003 with Cliff Reyle, Chief Human Resource and

5

Information Officer of Youth Villages, in response to which Mr. Reyle "laughed and made a comment to the [effect] you don't know what your job is." (Bailey Aff. ¶ 44.) According to Ms. Bailey, Mr. Reyle informed her at the same meeting that she was being terminated as follows: "[W]hat I hear you saying is Charmaine [Kromer] is dishonest and can't be trusted and you can't work with her, if I were her I wouldn't want to work with someone like you so I'm going to let you go." (Bailey Aff. ¶ 46.) He left the room and returned minutes later with the termination notice.

Ms. Bailey denies that her behavior during the meeting with Mr. Reyle was insubordinate, rude, or disrespectful, but states she simply felt she could not perform her job under the "expectations" set forth in the List.

The version of events as proffered by Youth Villages, on the other hand, is completely at odds with Ms. Bailey's version. According to Youth Villages, Ms. Bailey's termination had nothing to do with the incident involving Qusayy Godbolt nor even Ms. Bailey's ability to do her job. Rather, Youth Villages refutes altogether Ms. Bailey's version of the Godbolt incident and claims Ms. Bailey was terminated because of her unequivocal refusal even to try to do her job in accordance with the List of Expectations that was developed by Charmaine Kromer in an effort to assist Ms. Bailey in understanding and performing the job requirements expected of her as an MST Consultant.

More specifically, according to Ms. Kromer, while Ms. Bailey's March 2003 review, like her prior annual reviews, was "good overall," it noted certain areas in which she needed to improve, and Ms. Bailey's "former issues with timeliness, preparation, and other matters became more severe in the summer of 2003." (Kromer Aff. ¶¶ 13, 14.) Ms. Kromer contends she discussed certain areas of needed improvement with Ms. Bailey beginning in June 2003, and again in July. In early August, according to Ms. Kromer, Ms. Bailey called Ms. Kromer to express concerns about her weekly consultation meeting with Ms. Reiter-Lavery, and indicated that she felt "overwhelmed by all the expectations she had received from Ms. Reiter-Lavery and from Greg Winterburn, the licensed Clinical Program Supervisor assigned to work with Ms. Bailey in an advisory capacity." (Kromer Aff. ¶ 17.) As a result of that call, Ms. Kromer called Ms. Reiter-Lavery to discuss what expectations MST Services had of the MST Consultants, including Ms. Bailey. At that time, Ms. Reiter-Lavery allegedly reported to Ms. Kromer her concerns about Ms. Bailey's failure to progress in certain areas of her MST training as quickly as Ms. Reiter-Lavery felt she should.

Ms. Bailey was on vacation the week of August 11-18, 2003, so Ms. Kromer scheduled a meeting with both Ms. Reiter-Lavery and Ms. Bailey on August 22 to discuss the expectations. Ms. Kromer also met with Ms. Bailey before that meeting, on August 18, to go over Ms. Bailey's concerns about MST Services and Ms. Kromer's concerns with Ms. Bailey's performance. According to Ms. Kromer, she talked with Ms. Bailey about her habitual tardiness and low level of intensity as a Consultant and informed her that her performance was not where it needed to be in order for her successfully to complete the MST training. At that time, Ms. Kromer gave Ms. Bailey some job expectations orally, with the intent of helping her reach an acceptable level of performance so she could complete MST training. According to Ms. Kromer, Ms. Bailey became quite upset and told her she should not rely on information given to her from third parties.

Subsequently, at the August 22 meeting, Ms. Reiter-Lavery, Ms. Kromer, and Ms. Bailey discussed "overall expectations of a Clinical Program Supervisor/Consultant and concerns about Ms. Bailey's performance." (Kromer Aff. ¶ 23.) Ms. Reiter-Lavery reported at the meeting that some of the issues that Ms. Bailey had struggled with from the beginning as an MST Consultant had worsened over the past two months, and that when she had tried to discuss these issues with Ms. Bailey, Ms. Bailey always had presented reasons why she had not met her goals. Also during this meeting, in response to Ms. Bailey's concerns and suggestions regarding the expectations, Ms. Kromer agreed to certain modifications to assist Ms. Bailey in meeting the expectations.

According to Ms. Kromer, she developed a written list of job expectations for Consultants later that same day, August 22, based upon the items discussed at the meeting with Ms. Reiter-Lavery and Ms. Bailey. She presented the list to Barbara Grunow for her approval, and Ms. Grunow approved the list the same day.

On August 25, 2003, Ms. Reiter-Lavery had a telephone conversation with Ms. Bailey in which they discussed the fact that Ms. Bailey still had not sent her certain materials to be used at a quarterly training session Ms. Bailey was preparing to present to her teams. At the end of that telephone conversation, Ms. Bailey asked Ms. Reiter-Lavery if she thought she was a "good fit" for the Consultant job. Ms. Reiter-Lavery did not respond immediately, but in a subsequent conversation, she replied that since she was not Ms. Bailey's supervisor, she could not address her overall fit with her position, but she did have concerns about whether the MST training tasks were a good fit for Ms. Bailey in light of the challenges they had been addressing. Ms. Reiter-Lavery sent an e-mail to Ms. Kromer on August 26, 2003, documenting the contents

7

of her August 25 conversation with Ms. Bailey. (Kromer Aff. ¶ 27; Doc. No. 18, Ex. 4, 11/14/2005 Reiter-Lavery Aff. ("Reiter-Lavery Aff."), Ex. B.)

Although she allegedly developed the list and had it approved by Ms. Grunow on August 22, Ms. Kromer did not forward the list to Ms. Bailey until August 27. The e-mail stated:

> Hi, Shirley. Please review these and check for any misprints or mistakes on the Lisa R-Lavery requirements. I may have gotten something mixed up on those. I think it will be helpful for you and I to go over these in person on tomorrow or Friday, but wanted to send this to you ahead of time for your review. We have already talked about most of these but I think it is helpful to have them specifically written out so we are clear on what my overall expectations are for a consultant. All of the expectations are required of all consultants and Kathie [Coates] will have a copy of expectations as well for herself.
>
> Look over and be prepared to ask questions. Would there be a time tomorrow or Friday that we could talk about these?

(Kromer Aff., Ex. F.)

Ms. Bailey responded on August 28, stating, "Given the stipulations of your expectations, I feel that it is in the best interests of the families and Youth Villages that I not be required to do consultation with such restrictions. Therefore, I respectfully request that effective immediately the teams I consult with be covered by someone else until this matter is resolved." (Kromer Aff., Ex. F.) Ms. Kromer later learned that Ms. Bailey had left her job that day without authorization and driven to Memphis to request a meeting with Cliff Reyle.

Ms. Kromer and Ms. Bailey met again on August 29, 2003 to discuss Ms. Bailey's concerns. According to Ms. Kromer, Ms. Bailey's tone was defensive and agitated, and she requested a rationale for each "expectation" on the List. They did not finish going over each item at that meeting, so a follow-up meeting was scheduled for September 2, 2003. (para. 32.)

According to Youth Villages, when the two met again on September 2 to continue reviewing the List, Ms. Bailey informed Ms. Kromer that she did not agree with the MST Services expectations and thought they were unrealistic. An additional meeting was scheduled for September 9, 2003. Ms. Kromer stated that, because Ms. Bailey's tone at the September 2 meeting was aggressive and agitated, and she refused to listen to Ms. Kromer's explanations, Ms. Kromer decided to have a third party present at any subsequent meetings. Consequently, Barbara Grunow attended the meeting between Ms. Kromer and Ms. Bailey on September 9, 2003. At that meeting, Ms. Grunow explained to Ms. Bailey that the List was not part of a disciplinary plan but was designed to help Ms. Bailey improve her performance.

According to Ms. Kromer, the development of the List of Expectations had nothing to do with the Godbolt incident. Ms. Kromer began developing and discussing the expectations with Ms. Bailey, and allegedly had finalized the written list and gotten it approved by Ms. Grunow, before she even became aware of the issue involving Mr. Godbolt and a client's family. Further, Ms. Kromer states that, by the time Ms. Bailey mentioned the incident to her, Ms Kromer had already instructed Mr. Godbolt's supervisor, Rosalind Thompson, not to send Mr. Godbolt back into the home of the family that had made a racial comment and threat. Initially, according to Ms. Kromer, Ms. Thompson had agreed to continue to supervise the case and had not expressed any concern about it to Ms. Kromer. As soon as Ms. Thompson expressed to Ms. Kromer her own concern about working with the family, which occurred a few days later, Ms. Kromer avers that she removed her from the case. Ms. Kromer denies that she ever issued a "directive" that Mr. Godbolt be sent back into the home.

Finally, according to Ms. Kromer, she never issued any disciplinary action to Ms. Bailey throughout Ms. Bailey's employment at Youth Villages, and she did not make the decision to terminate her employment. She acknowledged, however, that the "situation with Ms. Bailey became very unworkable at the end due to her numerous statements that she did not trust me or the other staff . . . , that she did not want to work with us any further, and that she would not comply with the job expectations." (Kromer Aff. ¶ 44.)

Ms. Kromer's testimony is corroborated by that of Ms. Reiter-Lavery, and by Barbara Grunow, who describes Ms. Bailey's behavior during the September 9 meeting as "excessive and irrational" and "completely out of proportion to what was being discussed with her." (Doc. No. 17, Ex. 4, 11/10/2005 Grunow Aff. ("Grunow Aff.") ¶ 20.) Ms. Grunow met with Ms. Bailey again on September 16, at which point Ms. Kromer was taken out of the process, allegedly due to Ms. Bailey's angry statements that she could not longer trust Ms. Kromer and her demonstrated refusal to listen to anything Ms. Kromer had to say. At the September 16 meeting, Ms. Grunow discussed with Ms. Bailey her concerns about the Godbolt incident, which Ms. Bailey had first raised on or about August 29, 2003. During the September 16 meeting, Ms. Grunow informed her that she had explored Ms. Bailey's concerns and the investigation had not substantiated the concerns about racial discrimination that Ms. Bailey had raised.

According to Ms. Grunow, she also informed Ms. Bailey at that meeting that her request for a transfer could not be approved. Ms. Grunow asserts that she assured Ms. Bailey that she had reviewed the

9

expectations established by Ms. Kromer and found them to be reasonable, and told Ms. Bailey that if she could not agree to follow her supervisor's expectations, she could either resign or, if she refused to try to meet the expectations, she might be terminated. According to Ms. Grunow, Ms. Bailey responded negatively, stating the job expectations were unrealistic and were designed to push her out of her job.

After that meeting, Ms. Bailey demanded a meeting with Cliff Reyle and Ms. Grunow, which took place on October 2, 2003. According to both Ms. Grunow and Mr. Reyle, it was not their intention at the outset of that meeting to terminate Ms. Bailey's employment, though they realized that it was one possible outcome of the meeting. At the meeting, according to Mr. Reyle and Ms. Grunow, Ms. Bailey stated emphatically that she could not and would not work under Ms. Kromer's supervision any longer, and categorically refused to try to comply with the List of Expectations developed by Ms. Kromer, whom she accused of being unethical and inept as a manager. At some point, Mr. Reyle explained to Ms. Bailey that her only option, if she wanted to remain employed at Youth Villages, was to go back to work under Ms. Kromer, whom he would ask to work with Ms. Bailey on the job expectations. Ms. Bailey allegedly refused, so Mr. Reyle informed her it would be necessary to terminate her employment. In his Affidavit, Mr. Reyle states that Ms. Bailey's termination was his decision alone, and the decision was based solely upon Ms. Bailey's "insubordinate behavior and her continued assertions that she would no longer work with Ms. Kromer under the job expectations Ms. Kromer had set." (Doc. No. 17, Ex. 6, 11/09/2006 Reyle Aff. ¶ 43.)

## II.   SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

In evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587; Wade v. Knoxville Utils. Bd., 259 F.3d 452,

460 (6th Cir. 2001). Justifiable inferences based on facts are also to be drawn in favor of the non-movant. Kalamazoo River Study Group v. Rockwell Int'l Corp., 171 F.3d 1065, 1068 (6th Cir. 1999). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" Little Caesar Enters., Inc. v. OPPCO, LLC, 219 F.3d 547, 551 (6th Cir. 2000) (quoting Liberty Lobby, 477 U.S. 242, 249). If, however, the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. See Williams v. Ford Motor Co., 187 F.3d 533, 537–38 (6th Cir. 1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." Gaines v. Runyon, 107 F.3d 1171, 1174–75 (6th Cir. 1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Shah v. Racetrac Petroleum Co., 338 F.3d 557, 566 (6th Cir. 2003) (quoting Liberty Lobby, 477 U.S. at 252). Thus, the court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Amway Distribs. Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Liberty Lobby, 477 U.S. at 251–52). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative" or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Liberty Lobby, 477 U.S. at 249–52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citations omitted).

### III.     DISCUSSION AND ANALYSIS

#### A.     Plaintiff's Discrimination Claims

Ms. Bailey's claims for age and race discrimination are brought under Title VII and the THRA. Although Plaintiff does not expressly allege a cause of action under the Age Discrimination in Employment Act ("ADEA"), the THRA creates a cause of action for age discrimination, and a cause of action for age discrimination is analyzed under the same standards whether the ADEA or the THRA is applied. In fact, because the "stated purpose and intent of the [THRA] is to provide for execution within Tennessee of the

11

policies embodied in the federal civil rights laws," Campbell v. Fla. Steel Corp., 919 S.W.2d 26, 31 (Tenn. 1996), the analysis of discrimination claims under the THRA is the same as under Title VII and the ADEA. See also Tenn. Code Ann. § 4-21-101(a) ("It is the purpose and intent of the general assembly by this chapter to . . . [p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964, 1968, and 1972 . . . and the Age Discrimination in Employment Act of 1967, as amended."); Wade v. Knoxville Utils. Bd., 259 F.3d 452, 464 (6th Cir. 2001).

Under Title VII, the ADEA and the THRA, a plaintiff seeking to establish a claim of age or race discrimination must first prove a *prima facie* case of discrimination. Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). An employee "may establish a *prima facie* case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, or by showing the existence of facts which create an inference of discrimination." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1248 (6th Cir. 1995) (internal citations omitted). Where, as here, no direct evidence of discrimination is available, the plaintiff may establish her *prima facie* case of discrimination with indirect, circumstantial evidence by showing that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently from similarly situated members of the unprotected class or was replaced by a member of a non-protected class. McDonnell Douglas, 411 U.S. at 902; Knox v. Neaton Auto Prods. Mfg., Inc., 375 F.3d 451, 456–57 (6th Cir. 2004). In age discrimination cases, the fourth element is modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person. Grosjean v. First Energy Corp., 349 F.3d 332, 335 (6th Cir. 2003).

Once the plaintiff establishes a *prima facie* case, which is not difficult, then the burden of production shifts to the defendant/employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection" or the disparate treatment. Burdine, 450 U.S. at 253 (quoting McDonnell Douglas, 411 U.S. at 802); Dennis v. White Way Cleaners, L.P., 119 S.W.3d 688, 694 (Tenn. Ct. App. 2003). The burden of persuasion stays at all times with the plaintiff. Burdine, 450 U.S. at 253. Thus, if the defendant carries its burden of production, the plaintiff must then prove that the proffered reasons are pretextual. Burdine, 450 U.S. at 253 (citing McDonnell Douglas, 411 U.S. at 804). In order to show that a proffered legitimate, non-discriminatory reason for an adverse employment action is pretextual, a plaintiff must show " 'either (1)

12

that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge.' " Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).

### 1. Plaintiff's Prima Facie *Case of Age Discrimination*

As indicated above, one of the elements of a *prima facie* case of age discrimination is that the plaintiff was treated differently than or replaced by a significantly younger person. Grosjean, 349 F.3d at 335. Ms. Bailey has presented no evidence whatsoever regarding the age of any other employee at Youth Villages other than herself, including that of the other MST Consultants, any of her supervisors, or the employee who replaced her. Consequently, Ms. Bailey has not shown that she was treated less favorably than a substantially younger but otherwise similarly situated employee. Accordingly, she has not established a *prima facie* case of age discrimination. Youth Villages is entitled to summary judgment on that claim.

### 2. Plaintiff's Prima Facie *Case of Race Discrimination*

Ms. Bailey has met the first element of her *prima facie* case of race discrimination, since she is African-American and therefore a member of a protected class. Moreover, Youth Villages does not dispute the fact that Ms. Bailey was qualified for her job, and she undeniably suffered an adverse employment action when her employment was terminated. She was apparently replaced by a person outside the protected class. Accordingly, with respect to her discharge, Ms. Bailey has clearly established a *prima facie* case of discrimination.

Ms. Bailey also claims that she suffered an adverse employment action when she received the List of Expectations in late August 2003, as, according to Ms. Bailey, that list constituted an undeserved disciplinary action that resulted from her refusal to comply with Ms. Kromer's racist insistence that Mr. Godbolt be sent into the home that had made racial threats against him. Youth Villages maintains that the List was not a disciplinary action at all and that Ms. Bailey was never, throughout her tenure with Youth Villages, subject to any disciplinary action. Youth Villages also points out that the other Consultant supervised by Charmaine Kromer, Kathi Coates, received and signed off on a nearly identical List. Ms. Bailey argues in response that Ms. Coates was not an MST Consultant, so the list had a different impact on her than on Ms. Bailey. In fact, the list provided to Ms. Coates was missing one item that was included on Ms. Bailey's list, which stated:

13

8. Shirley will follow all requirements of her training as a consultant with MST services including the following:
    a) Shirley will send a tape each week to Lisa R-Lavery for review. Shirley will e-mail this supervisor each time a tape is sent.
    b) Shirley will obtain a tape each week from a designated supervisor with the goal of reviewing 3 out of 4 of the tapes.
Shirley will type out feedback on a form that will be sent to the regional and this supervisor. Tape feedback will be conducted in conjunction with the regional and consultant.
    c) Shirley will review and send three development plans each month to Lisa R-Lavery by the 10th of the month.
    d) Shirley will complete MST booster agendas in the designated time frame given by Lisa R-Lavery.

(Doc. No. 37, Ex. E.)

The Sixth Circuit has addressed the issue of what constitutes an "adverse employment action" as follows:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999). In addition, "[t]he Sixth Circuit has consistently held that *de minimis* employment actions are not materially adverse and, thus, not actionable." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000).

Ms. Bailey does not claim that the List resulted in a reduction in her salary or benefits, that her title was changed, or that her material responsibilities were reduced. Instead, she appears to be claiming that her employment responsibilities were unreasonably increased, that certain restrictions were imposed upon her such that it became impossible for her to perform all of her job responsibilities satisfactorily, and that she was essentially "set up to fail" (Doc. No. 22, at 7) by being subjected to heightened scrutiny and unfair demands that were not made upon the white MST Consultants. The evidence presented by Ms. Bailey is somewhat slim, consisting primarily of Ms. Bailey's own testimony unsubstantiated by any documentary evidence. The Court is particularly troubled by the fact that Ms. Bailey makes no effort to catalogue the differences between her understanding of her job responsibilities before and after imposition of the List in order to demonstrate that the changes in her job responsibilities, and in particular the increase in her workload, were actually material and substantial. The only "evidence" in that regard, really, is Ms. Bailey's repeated insistence that the List was

14

unreasonable and inconsistent with her job responsibilities as she understood them. The Court nonetheless concludes that Ms. Bailey has at least created a jury question as to whether the imposition of the List of Expectations constituted a materially adverse employment action, particularly given that she received the List within just a few months of a highly favorable annual assessment. Cf. Ford v. Gen. Motors Corp., 305 F.3d 545, 553–54 (6th Cir. 2002) (finding plaintiff's allegations of an increased workload and heightened scrutiny together with his constructive discharge constituted a materially adverse employment action sufficient to satisfy that prong of his *prima facie* discrimination claim).

With respect to whether Ms. Bailey was treated differently from similarly situated employees outside the protected class, Youth Villages claims that Ms. Bailey was not subject to any disparate treatment with respect to her receipt of the List of Expectations, since Kathi Coates was also subject to the List. The evidence suggests, however, that the List given to Ms. Bailey was not identical to that given to Ms. Coates, *and* that the List was specifically developed to address alleged problems perceived with Ms. Bailey's performance. There is no indication that Ms. Coates was receiving the same level of scrutiny. Further, Ms. Grunow, as Ms. Kromer's direct supervisor, approved the List but apparently did not require it for the other MST Consultants in her area, all of whom, apparently, were white. The Court therefore concludes that Ms. Bailey has established a *prima facie* case of race discrimination in association with the List of Expectations as well as with respect to her discharge.

### 2. Youth Villages' Legitimate, Non-Discriminatory Reasons For Actions

#### (a) Defendant's Non-Discriminatory Reason For Termination

Youth Villages has also articulated a legitimate, non-discriminatory reason for the termination of Ms. Bailey's employment. Cliff Reyle, Youth Villages' Chief Human Resource and Information Officer, testified that he alone made the decision to terminate Ms. Bailey's employment, and that the decision was based solely upon Ms. Bailey's categorical refusal to work with her supervisor, Charmaine Kromer, or to make an effort to comply with the List of Expectations developed by Ms. Kromer, which Ms. Kromer's supervisor had determined was reasonable and appropriate.

#### (b) Defendants' Non-Discriminatory Reason For List Of Expectations

Youth Villages has also articulated a legitimate, non-discriminatory reason for the development of the "List," and requiring Ms. Bailey to attempt to comply with it: Youth Villages contends Ms. Bailey was having

15

difficulty performing satisfactorily some of the essential tasks associated with her position as MST Consultant and the List was intended to assist her in completing her MST Consultant training by helping her plan and execute those tasks in a timely fashion.

### *3. Whether the Reasons Were Pretextual*

As set forth above, in order to show that a proffered legitimate, non-discriminatory reason for an adverse employment action is pretextual, a plaintiff must show " 'either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.' " Manzer, 29 F.3d at 1084. "The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's [adverse employment action] never happened, i.e., that they are factually false." Id. With the second type of showing, "the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." Id. (emphasis in original). The third type of showing "consists of evidence that other employees, particularly employees not in the protected class, [did not suffer an adverse employment action] even though they engaged in substantially identical conduct to that which the employer contends motivated [the plaintiff's adverse employment action]." Id.

#### *(a) Whether the Reason For Termination Is Pretextual*

With respect to her termination, as Youth Villages argues, Ms. Bailey cannot show that the reason proffered by Youth Villages for her termination was "factually false," since it is undisputed that Ms. Bailey repeatedly stated her refusal to comply with her supervisor's job expectations, even though at least two members of Youth Villages' management team instructed her that the expectations were reasonable and that Ms. Bailey must make an effort to meet the expectations in order to remain employed. Notwithstanding, Ms. Bailey has succeeded in creating a disputed issue of fact as to whether the List of Expectations itself was reasonable. If the List was unreasonable and unrealistic, then her objections to it might be reasonable. Consequently, firing her for reasonable objections would give rise to a suspicion that her objections to the List were not the real motivation behind firing her. Ms. Bailey has succeeded in presenting just slightly more than a scintilla of evidence, sufficient to defeat summary judgment, on the question of whether Youth Villages' proffered reason for her discharge was pretextual.

16

### *(b) Whether the Basis For Imposition Of the List Is Pretextual*

With respect to the List itself, according to Ms. Bailey's version of events, she was doing well at her job and had received nothing but positive reinforcement from both Lisa Reiter-Lavery and Charmaine Kromer with respect to the quality of her performance up until the Godbolt incident. Youth Villages points to Ms. Bailey's assessments as showing that there were areas in which she needed to improve, and further claimed that Ms. Bailey fell behind in those areas over the months following the assessment, instead of improving. Regardless, the annual assessment showed Ms. Bailey performed satisfactorily in all areas. The interim assessments offered by Youth Villages do not establish that Ms. Bailey was having difficulties to the extent alleged by Youth Villages. (See, e.g., Kromer Aff., Ex. B.)

In fact, according to Ms. Bailey, the expressions of dissatisfaction with her performance came unexpectedly, virtually out of the blue and in suspiciously close proximity to the Godbolt incident. In that regard, she also claims that the List, in setting forth burdensome and unrealistic requirements, intentionally created a situation in which she would inevitably fail in performing her job requirements. In other words, Ms. Bailey disputes Youth Villages' version of the events leading up to the issuance of the List as having no basis in fact. Because the Court is required to accept Ms. Bailey's version of events as true at this stage in the proceedings, the Court finds that Ms. Bailey has succeeded in creating an issue of fact as to whether the proffered reasons for providing the List of Expectations was pretext for discrimination.

Accordingly, Youth Villages' motion for summary judgment of Ms. Bailey's race discrimination claim under Title VII and the THRA must be denied.

**B.     Plaintiff's Retaliation Claim**

The standards for establishing a retaliation claim under Title VII closely parallel those of a discrimination claim. In order to survive summary judgment of her retaliation claim, Ms. Bailey must first establish the *prima facie* elements of a retaliation claim by showing that (1) she engaged in activity protected by Title VII; (2) her exercise of her protected rights was known to the defendant; (3) she was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and (4) there was a causal connection between the protected activity and the adverse employment action. See, e.g., Canitia v. Yellow Freight System, Inc., 903 F.2d 1064, 1066 (6th Cir.1990). As with a discrimination claim, once the plaintiff has established a *prima facie* case, the burden of production shifts to the defendant to articulate a

17

legitimate nondiscriminatory reason for the adverse action, at which point the burden shifts back to the plaintiff to prove that the articulated reason is a pretext for discrimination. Id. (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506–07, 515 (1993)).

Ms. Bailey contends that she complained of racial discrimination to her supervisors after the Godbolt incident and again after receiving the List of Expectations and before being terminated. She alleges that her complaints were known to her supervisors because she made the complaints directly to her supervisors. She was subjected to subsequent adverse employment actions when her employment was terminated and, as discussed above, when she received and was subjected to the List of Expectations.

The question remaining, then, is whether Ms. Bailey has shown sufficient evidence to raise a genuine issue of material fact as to the causal connection between her alleged complaints about racial discrimination and her receipt of the "List of Expectations" or her discharge. To establish the causal connection required by the fourth prong, a plaintiff must "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, provided it is credible." Nguyen v. City of Cleveland, 229 F.3d 559, 566 (6th Cir. 2000) (quoting EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997)). In making this determination, of course, the Court must view the evidence in the light most favorable to the non-movant and must draw all reasonable inferences in the non-movant's favor. See Ford v. Gen. Motors Corp., 305 F.3d 545, 555 (6th Cir. 2002).

The allegedly retaliatory behavior against Ms. Bailey occurred almost immediately after her alleged complaint that Ms. Kromer acted discriminatorily in the Godbolt incident, and she was discharged barely a month after that incident and in the immediate aftermath of her complaints about the List of Expectations. The Sixth Circuit has found timing to be relevant to a showing of causal connection. "Although 'temporal proximity alone will not support an inference in the face of compelling evidence' to the contrary, 'the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection.'" Ford, 305 F.3d at 554–55 (quoting Moon v. Transp. Drivers, Inc., 836 F.2d 226, 229 (6th Cir. 1987)).

Generally speaking, however, in order to show causal connection, a plaintiff must demonstrate some evidence of retaliatory conduct in addition to temporal proximity. See Nguyen, 229 F.3d at 566. The Sixth Circuit has found that evidence suggesting a plaintiff "may have been subjected to excessive scrutiny of his

18

conduct and may have experienced 'more frequent disciplinary writeups . . . for trivial matters,' " constituted evidence of retaliatory conduct.  See, e.g., Parries v. Makino, Inc., 148 Fed. Appx. 291, 301 (6th Cir. 2005); Moore v. KUKA Welding Sys., 171 F.3d 1073, 1080 (6th Cir. 1999); see also Harrison v. Metro. Gov't of Nashville & Davidson County, 80 F.3d 1107, 1119 (6th Cir.1996) ("More important, however, is the fact that study of the record in this case reveals an atmosphere in which the plaintiff's activities were scrutinized more carefully than those of comparably situated employees.").  Allegations of an increased workload may also be considered pertinent to the determination of causal connection.  See Ford, 305 F.3d at 555.

While the evidence of a causal connection in this case is scant, the Court nonetheless finds it sufficient to permit Ms. Bailey to establish her *prima facie* case of discrimination.  The very close temporal proximity coupled with the sudden intensified scrutiny of her performance when she had previously been considered to be performing just fine, and the alleged increased workload associated with the List of Expectations, together create a disputed issue of fact as to whether there is a causal connection between Ms. Bailey's alleged reports of discrimination and the allegedly retaliatory actions.

The analysis of Youth Villages' proffered legitimate, non-discriminatory reasons for the adverse employment actions, and Ms. Bailey's rebuttal of same, applied above in the context of consideration of the discrimination claim also apply in the context of the retaliation claim.  Thus, for the same reasons set forth above, the Court finds that Ms. Bailey has raised disputed issues of fact sufficient to avoid summary judgment of her retaliation claim.

## IV.     CONCLUSION

The Court observes that at the conclusion of all the proof, the Court will likely be called upon to reevaluate whether any reasonable jury could find that Ms. Bailey's refusal to work with her supervisor or to follow instructions was justified by the imposition of the List of Expectations, or whether her actions constituted inexcusable conduct justifying her discharge.  For now however, for the reasons set forth above, the Court

will deny Youth Villages' motion for summary judgment as to Ms. Bailey's race discrimination and retaliation claims under Title VII and THRA. Summary judgment will be granted as to Ms. Bailey's age discrimination claims.

An appropriate Order will enter.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge